# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
# AT KNOXVILLE
## October 21, 2014 Session

## STATE OF TENNESSEE v. TERRENCE LAMONT MCDONALD

### Appeal from the Criminal Court for Knox County
### No. 99367   Steven Sword, Judge

---

### No. E2013-02524-CCA-R3-CD - Filed January 13, 2015

---

Following a jury trial, Terrence Lamont McDonald ("the Defendant") was convicted of four counts of aggravated rape and one count of reckless endangerment, as a lesser-included offense of aggravated assault. At a sentencing hearing, the trial court merged the Defendant's convictions for aggravated rape in counts two and four into his aggravated rape convictions in counts one and three, respectively. The trial court imposed a total effective sentence of 25 years in the Department of Correction. In this direct appeal, the Defendant raises claims that: 1) the State violated <u>Batson</u> by striking African-American potential jurors from the venire; 2) the State committed prosecutorial misconduct in closing argument; 3) the trial court erroneously admitted evidence under Tennessee Rule of Evidence 404(b); 4) his convictions for two counts of aggravated rape violate principles of double jeopardy; 5) count five of the indictment fails to state an offense; 6) the Defendant's conviction for reckless endangerment in count five violated his right to an unanimous verdict; and 7) the trial court abused its discretion in sentencing. Following a thorough review of the record and relevant authorities, we discern no error and affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR., and D. KELLY THOMAS, JR., JJ., joined.

Cameron D. Bell (at sentencing and on appeal), Knoxville, Tennessee; Mark Stephens, District Public Defender; and John Halstead, Assistant Public Defender (at trial), Knoxville, Tennessee, for the appellant, Terrence Lamont McDonald.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Senior Counsel; Charme Allen, District Attorney General; and Leslie Nassios, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This case stems from a violent sexual assault committed against the Defendant's wife, K.M.,[1] in January 2012. In April 2012, the Knox County Grand Jury indicted Terrence Lamont McDonald ("the Defendant") on four counts of aggravated rape, a Class A felony, and one count of aggravated assault, a Class C felony. Following a jury trial, the Defendant was convicted of four counts of aggravated rape and one count of reckless endangerment, a Class E felony, as a lesser-included offense of aggravated assault. At a sentencing hearing, the trial court merged the convictions for aggravated rape in counts two and four into the aggravated rape convictions in counts one and three.[2] The trial court then sentenced the Defendant, as a Range I standard offender, to concurrent sentences of 25 years at 100% on each aggravated rape conviction and two years at 30% for reckless endangerment, for a total effective sentence of 25 years in the Department of Correction. The Defendant filed a timely motion for new trial, which the trial court denied after a hearing. This timely appeal followed.

## I. Factual Background

### Rule 404(b) Hearing

Before trial, the State filed a motion requesting that the trial court rule on the admissibility of certain evidence under Rule 404(b) of the Tennessee Rules of Evidence. During a hearing on the motion, K.M. ("the victim") testified about acts of physical abuse committed by the Defendant over the course of their five-month marriage. She explained that the incidents of abuse increased over time until they argued "daily." According to the victim, during arguments the Defendant would "grab [her] arms and hold [her] arms really tight and get on top of [her] to the point where [she] couldn't breathe." The victim recalled that about two months prior to the instant offenses, the Defendant had "head butted" her during an argument. The victim also claimed that three or four times a week, the Defendant would act like he was going to stab her with a knife. She did not report any of these prior incidents to police because the Defendant would "make [her] feel guilty" and tell her, "God wouldn't like that."

---

[1] It is the policy of this Court to refer to victims of sexual assault by their initials only.

[2] The Defendant was indicted under alternative theories for two distinct offenses of aggravated rape based upon the part of the victim's body penetrated. Specifically, count one concerned the penetration of the victim's vagina while the Defendant was armed with a weapon. As an alterative theory to count one, count two alleged the penetration of the victim's vagina that resulted in bodily injury. Count three concerned the penetration of the victim's anus while the Defendant was armed with a weapon, and count four charged the penetration of the victim's anus resulting in bodily injury as an alternative theory.

The victim also testified that during their marriage, the Defendant was "very, very controlling" and would coerce her into having sex. The Defendant would tell her, "The Bible says that you're mine so I can have sex with you whenever I want to, however, I want to."

At the conclusion of the victim's testimony, the State explained that it intended to introduce into evidence a report from the sexual assault nurse examiner ("SANE"), which was prepared after the nurse's examination of the victim. The SANE report contained a general statement under the heading "Forensic Nursing Narrative" that the "client reports domestic violence since 8/11." The Defendant objected to the introduction of the SANE report, arguing that because the victim never reported the prior incidents of domestic abuse there was "simply no clear and convincing evidence that these events occurred." The Defendant also expressed concern that the jury would be overwhelmed by allegations of prior abuse and think "something must have occurred with all of these allegations."

The trial court found that the State had established the Defendant's prior bad acts by clear and convincing evidence, as required by Rule 404(b). However, the court ruled that the victim could not testify about any specific, prior instances of actual physical violence by the Defendant. Under the court's ruling, the victim could not discuss the head-butting incident or the Defendant's sitting on her chest and pointing knives at her. However, the trial court allowed the victim to "talk about her fear, things about state of mind and in a general sense." The court found that this evidence was relevant to the issues of the Defendant's intent and state of mind and whether the victim consented to the sexual encounter with the Defendant. The court explained:

> When you have a spousal rape situation like this, I think it's reasonable for a juror to be thinking, well, these are two individuals who obviously have consented to sex in the past, so consent, in my mind, and [the Defendant's] understanding on whether or not the–his wife is consenting to that sex at that time, too, I think, are material issues. And therefore, there is a large degree of relevance concerning these incidents that led up to each individual's understanding of where they found themselves, what was their–what was the [D]efendant's intent and what was her intention on consenting or showing lack of consent.

Finally, the trial court concluded that the probative value of the evidence was not outweighed by the danger of unfair prejudice. The trial court did not rule on the admissibility of the SANE report.

## *Voir Dire*

At the beginning of voir dire, the trial court introduced the Defendant to the venire and asked if anyone knew the Defendant. One juror, Ms. Griffin, indicated that she knew the Defendant. Ms. Griffin explained that she was the supervisor for Knoxville Area Transit and that she had talked to the Defendant while he rode her bus. She then commented that she did not know the Defendant "personally." Ms. Griffin denied that knowing the Defendant would make it difficult for her to be fair and impartial.

Later, during the prosecutor's questioning of potential jurors, the following exchange took place:

> STATE: Do any of you believe that the law should require the State to prove more than just the verbal account of the witness, the victim in the case? You're gonna require the State to prove anything else–can you consider her testimony alone? Does anybody have any difficulty with that? I think you may have heard anecdotally of cases of rape where it's called he said, she said. Are you familiar with that term? Does anybody have a problem with–if this were that sort of case, would you have a problem being on this jury?

> MR. WADE: Repeat that question, please. Explain what you mean.

> STATE: If the only proof that you were to hear in this case was just the testimony of the victim, do you believe that you could consider her credibility and judge whether or not you believe she's telling the truth without hearing any other evidence? Is her testimony alone enough for you?

> MR. WADE: No.

> STATE: Okay. And so, you're–what you're telling us is you would require the State to give you something else?

> MR. WADE: Yes.

> STATE: And you can't consider just the testimony alone of the victim no matter how credible you find her?

-4-

MR. WADE:        (no audible answer).

STATE:           Well, in a situation where the parties are married and where they had consensual relations in the past, do you agree that it really wouldn't be material to have DNA evidence in a case like that?

MR. WADE:        Yes, but you asked the question if I needed more evidence other than just her testimony, and I said yes.

STATE:           Right, okay. And DNA evidence is typically the type of evidence–

MR. WADE:        That's more evidence so yes.

* * *

STATE:           Well, what if it was a situation where–that the defense was consent and the defendant says, well, she consented? Do you see that DNA evidence wouldn't really be material in a case of that nature? Because we're not trying to establish identity in that situation. Do you understand that, Mr. Wade?

MR. WADE:        Yes.

STATE:           Okay. Very well. Well, let me ask you, what other evidence would you want to hear in a case involving an allegation of rape?

MR. WADE:        I'm not trying the trial. I don't know. You know, that's a burden that's yours.

STATE:           Well–

MR. WADE:        Not me.

STATE:           If you heard medical proof that there were injuries that were consistent with what the victim alleged, would you be able to consider that–

-5-

MR. WADE:          Yes.

STATE:             –as corroboration?

MR. WADE:          Yes.

At another point during voir dire, the prosecutor asked if it would bother anyone that the victim did not immediately call police and report the rape. One juror, Mr. Minefield, responded, "Well, it brings up questions of why didn't she leave. Is there children involved, or what was the circumstances for her not to leave? I would have left right away if someone assaulted me." The following colloquy then took place:

STATE:             Can you imagine a situation where a victim might be smaller and more physically vulnerable than her assailant that might affect–

MR. MINEFIELD:     Nowadays, there are so many different sources that she could reach out to–she could have used a telephone and called–well, did she call the law right away? Did she call family members? I'm sure there is certainly someone she could have turned to.

STATE:             Well, let's say that she–she did the next day. You are saying that that would keep you from being able to assess her credibility completely?

MR. MINEFIELD:     No, I'm not saying that. I was just answering your question–

STATE:             Right.

MR. MINEFIELD:     –with my question. Why didn't she leave? Why wait?

While questioning other jurors about why a victim might delay reporting a rape, the prosecutor noted that Mr. Wade "look[ed] troubled." This exchange then took place between the prosecutor and Mr. Wade:

MR. WADE:          Oh, I didn't say nothing.

STATE:             I know you didn't.

MR. WADE:          I'm listening.  I'm listening.

STATE:             Well, maybe I'm reading too much into your expression.

MR. WADE:          I think you are.

STATE:             How do you feel about that?

MR. WADE:          I don't have an opinion.

During peremptory challenges, the trial court called for a bench conference when the State used a peremptory challenge to strike Mr. Minefield.  The court asked the prosecutor to state on the record her reason for striking the juror.  The prosecutor responded, "My reason is I did not like his response on the issue of what a rape victim should do about an immediate report.  He did not satisfy me at all . . . ."  The trial court found the prosecutor's reason satisfactory, saying, "I believe that is a reason to strike him."  The Defendant indicated that he had no objection to the State's striking Mr. Minefield.

Following additional peremptory challenges, the trial court asked the prosecutor to place on the record her reason for striking Mr. Wade.  The prosecutor explained, "[M]y reasons for him are, number one, he stated that he could not accept merely testimonial proof in a rape case, that he would require more evidence.  I think that disqualifies him.  Really, I could have argued for cause on that.  I think he was hostile toward me and verging on being combative, and I don't like him."  The Defendant objected to the peremptory challenge, arguing, "I think this is not a case where it's just the victim.  They're bringing in . . . supporting evidence.  He said he could consider the supporting evidence, so I think it's unfair to strike him."  The trial court found that Mr. Wade "would need something more than just the testimony [of the victim]" to convict, which was "not an accurate statement of the law."  The court found that Mr. Wade would not be able to follow the law and allowed the peremptory challenge.

In the final round of challenges, the Defendant objected when the State struck Ms. Griffin, commenting that "all of the African-American jurors are gone now."  The prosecutor explained, "My reason [for striking Ms. Griffin] is that she knows the defendant personally.  She immediately recognized him as the one who frequently rides her bus.  Now, he's–she speaks to and talks to and that she's had conversations with."  The prosecutor argued that it would not be fair to force the State to go forward with a juror who knew the Defendant.  The trial court allowed the peremptory challenge, finding that Ms. Griffin's previous conversations with the Defendant were a sufficient basis for the strike.

## Trial Testimony

The victim testified that she and the Defendant dated for four months before getting married in August 2011. The victim explained that it was not a happy marriage, and she and the Defendant "argued every day." She recalled that by January 2012, the arguments had increased in frequency and in violence.

The victim testified that on January 22, 2012, she received a telephone call from her mother early in the morning. The victim explained that the Defendant got upset at her because the phone call had awoken him, and they began "yelling back and forth at each other." At one point, the Defendant stood over the victim and asked if she was going to "keep on talking." When she responded in the affirmative, the Defendant put a dagger[3] to her throat and asked the victim if she wanted him to "cut [her] voice box out." The victim testified that the Defendant eventually calmed down and left their apartment, taking her car.

Later that evening, the Defendant and the victim began arguing again. The victim told the Defendant that she was going upstairs to take a shower. After she turned on the shower, the Defendant called her back downstairs. The victim testified that when she got halfway down the stairs, the Defendant grabbed her arm and pulled her the rest of the way down the stairs. The Defendant slung her onto the couch and told her he "wanted some," which the victim understood to mean that he wanted sex. The victim refused, complaining to the Defendant that when she wanted to have sex, he would not have sex with her. The victim testified that she also refused because she was scared following their earlier argument when the Defendant put a dagger to her throat. At her refusal, the Defendant got angry and punched the victim in the chest. When the victim tried to get up, the Defendant pushed her down on the couch. The Defendant then took a box cutter and cut both sides of the victim's panties.[4] The victim recalled what followed thereafter:

> [The Defendant] yanked me up and put me on the side of the couch, and he pushed my head down to the pillow and he put his penis in my vagina and I was screaming, stop, I hate you, please don't, and he kept on, and I was telling him that he hurt me, and he took it out and put it in my anus. And then he was done, and I ran upstairs and took a shower.

---

[3] The victim testified that the Defendant collected knives and swords, which he kept in their living room. Throughout the trial proceedings, the weapon held to the victim's throat is referred to as a dagger and a knife, interchangeably.

[4] The victim testified that at the time of the assault, she was wearing only a t-shirt and lace panties.

The victim testified that during the sexual assault, the Defendant struck her in the back of the head, resulting in swelling. The Defendant also left "claw marks" where he held her leg. She testified that she did not give the Defendant permission to have vaginal or anal sex with her, and the Defendant knew she objected to the acts because she was "screaming and telling him no and trying to push him off."

The victim spent the night at the apartment following the attack. She explained that if she had tried to leave, the Defendant would have stopped her, and she was afraid he would hurt her. The next day, the victim left the apartment to pick up her children from school. When she returned and found the Defendant asleep, she got back in her car and drove around the building to a shed. The victim testified that she had placed some clothes in the shed after the Defendant put the dagger to her throat. The victim retrieved her clothes, dropped off her children with their father, and went to her mother's house. The following day, she went to a safe house. She filed a formal complaint against the Defendant on January 25, 2012, three days after the assault. The victim also obtained an order of protection against the Defendant for herself and her children.

On cross-examination, the victim acknowledged that the Defendant had high blood pressure, and the Defendant had told her that it made him physically sick when they argued. She denied that the Defendant told her that when they argued he got headaches and could not have sex. The victim also denied talking to the Defendant's mother about his refusing to have sex with her, although she admitted that she and the Defendant had arguments about the subject. The victim acknowledged that the Defendant did not prevent her from leaving the apartment or threaten her following the assault. She also agreed that she did not report the offenses until three days later.

According to the victim, she and the Defendant argued a lot about the Defendant's using her car because he did not have a license. Additionally, the victim had suspected that the Defendant was cheating, and she had accused him of deleting text messages from his phone so that she could not see with whom he had been communicating. The Defendant's unemployment was another source of tension during the marriage.

The victim testified that, two weeks before the sexual assault, she had asked the Defendant to move out of the apartment and for a divorce. Ultimately, the Defendant agreed that he would give the victim a divorce after 90 days. He also agreed to move out of their apartment in a month and a half. Despite reaching this agreement, the Defendant continued to argue against a divorce in the two weeks leading up to the offenses.

Laurine Rollins, a certified sexual assault nurse examiner and expert in forensic nursing examination, testified that she interviewed and examined the victim on January 25,

2012, at the Sexual Assault Center of East Tennessee. The victim reported to Rollins that she had been raped by her husband. In describing the victim's demeanor, Rollins stated that she "was crying. She was very depressed. She was humiliated, withdrawn. She was very sad."

In the course of the physical examination, Rollins noted injuries to the victim's neck and leg. The victim complained of general neck pain, and Rollins saw linear bruises on her neck. Rollins also observed an oval abrasion on the victim's right thigh where the skin had been broken and bruised. The victim also complained of pain when Rollins touched her head. Rollins photographed each of the victim's injuries and identified those injuries through photographs at trial. She testified that her visual examination was consistent with the injuries that the victim described as having resulted from the assault and rape. She also stated that the victim's injures were consistent with having been inflicted two to three days prior to her observation of them.

The victim told Rollins that she had suffered vaginal bleeding following the rape. During a pelvic exam, Rollins saw no visible trauma to the victim's vaginal or rectal area. She testified, however, that this finding was not unusual for women in child bearing years. She explained that because the cervix and vagina are "highly vascular area[s]," it is possible for a woman to have a small amount of blood come from the cervix area after a sexual assault, resulting in spotting afterwards. At the conclusion of her testimony, the State sought to introduce the SANE report prepared by Rollins. The Defendant stated he had no objection, and the trial court admitted the report.

Jeffery Damewood, an investigator with the Knoxville Police Department, testified that, on the morning of January 25, 2012, a victim's advocate, Teresa Williams, told him that "she had a lady in her office who was quite upset saying that she had been raped by her husband. She said that [the victim] had already spoken to [I]nvestigator Nuchols and that it . . . didn't go well." Investigator Damewood then agreed to speak with the victim. After hearing the victim's account of what had occurred on January 22, 2012, Investigator Damewood asked her to write out a statement about the offenses. Investigator Damewood also had the victim write out a statement about her interaction with Investigator Nuchols, which Investigator Damewood gave to his supervisor.

On January 26, 2012, the day following the Defendant's arrest, Investigator Damewood took the victim to her apartment to retrieve some clothing. While there, the investigator saw several different types of knives and swords in the living room. The victim identified the dagger that the Defendant had held to her throat, and Investigator Damewood took the item as evidence. Investigators could not locate the box cutter that the Defendant had used to cut off the victim's panties.

Investigator William Muhlfeld testified that he arrested the Defendant at the Defendant's apartment. Inside the apartment, he saw what looked like swords in the corner of the living room. While the investigator was looking for the victim's cut panties, he noticed that the trash can inside the apartment was empty. Investigator Muhlfeld searched a trash dumpster behind the residence and found a bag of trash that he identified as coming from the Defendant's apartment. Inside the bag of trash, Investigator Muhlfeld found panties that "fit the description and that were showed to have some cut marks on them." The victim subsequently identified the panties as belonging to her.

Investigator Muhlfeld advised the Defendant of his Miranda rights upon arrest. In a recorded conversation that followed, the Defendant admitted that he had sexually penetrated the victim, both vaginally and anally, on the evening of January 22, 2012. The Defendant also stated that he "may have hurt [the victim]." He admitted that they had been arguing earlier in the day before the sexual act. The Defendant also admitted that the victim told him "she hated him," either in the midst of the sexual act or while she took a shower following the sexual act. The Defendant claimed, however, that the sexual acts had been consensual.

At the conclusion of trial, the jury convicted the Defendant of four counts of aggravated rape and one count of reckless endangerment as a lesser-included offense of aggravated assault.

## Sentencing

At the Defendant's sentencing hearing, the State introduced the presentence report without objection from the Defendant. Reabor Henderson, the Defendant's mother, testified that the Defendant was the product of a rape that had occurred when she was 14 years old. She explained that because of this, the Defendant grew up without a father figure in his life. Henderson's mother helped raise the Defendant, but he also spent time in foster care when he was young. Henderson recalled that the Defendant grew up in a religious environment, and he went to church every Sunday. When the Defendant reached early adulthood, Henderson told him that he was the product of a rape, which was hard on the Defendant. Henderson stated that the Defendant did not have a "violent bone in his body." She believed the Defendant was not guilty of the offenses for which he was convicted.

Traycee Nared testified that she had been a friend of the Defendant for years, and they had even dated for a few months. Nared was "[b]arely" in a sexual relationship with the Defendant when they dated. She stated that the defendant was not a "sexual person." Nared used to argue with the Defendant because he was younger than she was, and she felt that he should be "gung-ho" about sexual relations. The Defendant, however, had the idea of a "godly woman that he want[ed] for his wife." Nared stated that she was a survivor of

multiple rapes, which caused her a lot of trauma, but she had allowed the Defendant into her life because he was not aggressive in any way. She described the Defendant as being "in church every Sunday" and testified that she trusted the Defendant to be alone with her granddaughters. Nared stated that she had never seen the Defendant with a weapon or known him to own weapons.

During his allocution, the Defendant stated that he had been under a lot of stress when the offenses occurred. He explained that, when he got married, he lost his job and had to work at a temporary service to make ends meet. The victim nagged him constantly, and he had to take blood pressure medication because he was in "stroke and heart attack territory." He had to see a psychiatrist to "keep [himself] in the spiritual mind frame." He stated that he and the victim had arguments because she wanted to change her life, and he was trying to help her. He wanted the victim to go to church with him and to stay away from certain friends, some of whom the Defendant called "a harlot" and "a thief." The Defendant tried to "be strict on [the victim] to the point of being biblical," and he said if that was his "only sin," then "it is what it is." The Defendant stated that he "did what [he] had to do as far as loving [his] wife," and that he "never did anything wrong to [his] wife."

When sentencing the Defendant, the trial court noted that it had reviewed the presentence report and the court's file and had considered the witness testimony, the Defendant's statement, and arguments of counsel. The trial court merged the Defendant's convictions for aggravated rape in counts two and four into the convictions for aggravated rape in counts one and three, respectively. The court found the Defendant to be a Range I, standard offender, and explained that the convictions for aggravated rape were "non-probatable" and had to be served at 100 percent.

As to sentence length, the trial court first considered relevant enhancement factors. Specifically, the trial court considered that the Defendant had a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range. The court noted that the Defendant had a prior felony conviction for theft from 2003, as well as misdemeanor convictions for theft, resisting arrest, and four counts of failure to appear. The court gave this enhancement factor "some weight." Additionally, the trial court found significant that the Defendant had failed to comply with the conditions of a sentence involving release into the community. It noted that the Defendant's probation for felony theft had been revoked and found that this enhancement factor also deserved "some weight." The final enhancement factor the trial court considered was that the Defendant abused a position of private trust.

The trial court also considered mitigating factors argued by the Defendant and found that the Defendant had not caused the victim serious bodily injury. However, the court

determined that the mitigating factor was "completely outweighed by not only the enhancement factors . . . but also the facts and circumstances of the case."

Regarding the facts and circumstances surrounding the offense and the nature of the offense, the trial court stated:

> [O]ne thing I know is, is that our community values the marital relationship and [] it should be protected, and I think the facts and circumstances that [the Defendant] would do this to his own wife, someone that he has an obligation to love and to care for, is significant to the Court and weighs heavily on my decision on the length of time.

The court found that the Defendant's actions

> went beyond just engaging in sexual intercourse with his wife. He not only raped her vaginally, but he didn't stop there. He then turned her over and raped her anally. And the humiliation that he subjected her to . . . is a heavy circumstance considering the nature–the criminal conduct involved in this case, that the Court believes is also entitled to a very large degree of weight.

Based upon these findings, the trial court sentenced the Defendant to 25 years on each aggravated rape conviction and two years for reckless endangerment. The court ordered all sentences to run concurrently, for a total effective sentence of 25 years at 100% in the Department of Correction.

## II. Analysis

### A. Batson Violation

The Defendant contends that the State's use of peremptory challenges to exclude three African American jurors from the venire violated his right to equal protection under the 14th Amendment of the United States Constitution. He contends that the prosecutor's stated reasons for challenging the potential jurors were a pretext for racial discrimination. The State responds that the trial court accredited the prosecutor's race-neutral explanations for the challenges and that the Defendant has failed to show that the prosecutor engaged in purposeful and impermissible discrimination.

"Peremptory challenges, along with challenges for 'cause,' are the principal tools that enable litigants to remove unfavorable jurors during the jury selection process." State v. Spratt, 31 S.W.3d 587, 598 (Tenn. Crim. App. 2000) (quoting United States v. Annigoni, 96

-13-

F.3d 1132, 1137 (9th Cir. 1996), overruled on other grounds as recognized in United States v. Lindsey, 634 F.3d 541, 544 (9th Cir. 2011)).  A peremptory challenge allows the removal of jurors who may exhibit hostility or bias but who are not removable for cause.  Id.

The use of a peremptory challenge to remove a juror on the basis of race, however, violates the Equal Protection Clause of the Fourteenth Amendment.  Powers v. Ohio, 499 U.S. 400, 409 (1991); Batson v. Kentucky, 476 U.S. 79, 97-98 (1986).  In Batson v. Kentucky, the United States Supreme Court established a three-step inquiry that a trial court must undertake in order to determine whether a juror was improperly challenged on the basis of race.  476 U.S. at 97-98.  To raise a Batson claim, the defendant must first make a prima facie showing of purposeful discrimination against a venire member.  Id. at 93-94.  Although Batson required the defendant to show both that he was a member of a cognizable racial group and that other members of that racial group were excluded from the jury, Batson, 476 U.S. at 96, the United States Supreme Court subsequently held that the defendant need not be a member of the same racial group as the improperly excluded juror, Powers, 499 U.S. at 406.  Under Powers, a defendant can establish a prima facie case of purposeful discrimination merely by demonstrating that the prosecution excluded members of a cognizable racial group from the jury pool.  State v. Echols, 382 S.W.3d 266, 281 (Tenn. 2012).  The defendant must show that the relevant circumstances raise an inference that the State was employing its peremptory challenges for the purpose of excluding jurors on the basis of race.  Batson, 476 U.S. at 96.  Although a disproportionate number of challenges directed at members of a particular racial group may establish a prima facie case, State v. Kiser, 284 S.W.3d 227, 255 (Tenn. 2009), "the exercise of even one peremptory challenge in a purposefully discriminatory manner would violate equal protection."  Ellison, 841 S.W.2d at 827.

Once the defendant has established a prima facie case of discriminatory challenges, the burden shifts to the State to articulate a neutral reason for excluding the juror or jurors.  Batson, 476 U.S. at 97.  Although a prosecutor's bare assertion that the strike was not discriminatory will not suffice, the reason given does not have to prove persuasive or even plausible to satisfy the State's burden.  Ellison, 841 S.W.2d at 827;  Kiser, 284 S.W.3d at 255. The explanation need not provide a reason that would justify excusing the juror for cause.  Batson, 476 U.S. at 97.

If the prosecutor articulates a neutral reason for excluding the juror or jurors, "the trial court must then determine, from all of the circumstances, whether the defendant has established purposeful discrimination."  State v. Hugueley, 185 S.W.3d 356, 368 (Tenn. 2006) (citing Batson, 476 U.S. at 98).  This requires the trial court to examine the prosecution's reasoning to ensure it is not pretextual.  Id.  Under this last prong, "the party raising the Batson objection bears the burden of persuading the trial court that the other party

-14-

has engaged in purposeful and impermissible discrimination." Kiser, 284 S.W.3d at 258 (citing Batson, 476 U.S. at 93); see Purkett v. Elem, 514 U.S. 765, 768 (1985) (noting that "the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike"). For the trial court, "the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed." Hernandez v. New York, 500 U.S. 352, 365 (1991); see Kiser, 284 S.W.3d at 259.

This court has previously noted that "determination of the prosecutor's discriminatory intent or lack thereof turns largely on the evaluation of the prosecutor's credibility, of which the attorney's demeanor is often the best evidence." State v. Smith, 893 S.W.2d 908, 914 (Tenn. 1994); see Kiser, 284 S.W.3d at 255. Accordingly, the trial court's findings in this regard are attributed great weight and will not be set aside unless they are clearly erroneous. Kiser, 284 S.W.3d at 255 (citing Hugueley, 185 S.W.3d at 369). For this reason, when ruling on a Batson challenge, the trial court must give specific reasons for each of its factual findings, including: (1) whether the objecting party has established a prima facie showing of purposeful discrimination; (2) whether the responding party has shown a neutral basis for the challenge; and (3) whether the totality of the circumstances support a finding of purposeful discrimination. Hugueley, 185 S.W.3d at 369 (citing Woodson v. Porter Brown Limestone Co., 916 S.W.2d 896, 906 (Tenn. 1996)).

In this case, following the prosecutor's use of a peremptory challenge to strike the first African-American potential juror, Mr. Minefield, the trial court asked the prosecutor to state on the record her reason for excluding him. The prosecutor provided a race-neutral reason for the strike, citing her concern about his views on whether a rape victim should immediately report a rape. The trial court found the prosecutor's reason satisfactory and agreed that it was a valid reason to strike Mr. Minefield. Moreover, when specifically asked by the trial court, the Defendant stated that he had no objection to the exclusion of Mr. Minefield. We cannot conclude purposeful discrimination on the part of the prosecutor under these circumstances.

Regarding Mr. Wade, the second African-American member of the venire, the prosecutor provided several race-neutral reasons for striking him. First, in response to her questions, Mr. Wade told the prosecutor that he would require the State to put on additional evidence, beyond the victim's testimony, before he would convict the Defendant. The prosecutor also noted that Mr. Wade had been hostile toward her during voir dire. The trial court concluded that, based upon his comments, Mr. Wade would not be able to follow the law and allowed the peremptory challenge. The Defendant directs our attention to nothing in the record that would establish that the trial court's determination was erroneous. Mr. Wade's responses in voir dire revealed a potential bias against the State's most critical witness–the victim. This provided the State with a readily-defensible reason for its strike.

The Defendant failed to persuade the trial court that the State engaged in purposeful and impermissible discrimination when it struck Mr. Wade, and he has not persuaded this court on appeal.

Finally, the State excluded the third African-American potential juror, Ms. Griffin, because she knew the Defendant and had previous conversations with him while on her bus. The trial court allowed the peremptory challenge, finding that Ms. Griffin's previous conversations with the Defendant were a sufficient basis for the strike. By ruling in favor of the State, the trial court necessarily assessed the prosecutor's credibility and accredited the State's proffered reason for the strike. The trial court was in the best position to assess the demeanor of the prosecutor, and the Defendant has not established on appeal that the trial court's determination was clearly erroneous. Thus, the Defendant's claim for relief on the grounds that the State violated Batson is denied.

## B.  Rule 404(b) Violations

The Defendant contends that the trial court admitted the SANE report in violation of Rule 404(b) of the Tennessee Rules of Evidence because the report contained a statement from the victim that domestic assault had been occurring since August of 2011. He further asserts that the admission of the victim's testimony regarding the Defendant holding a dagger to her throat violated Rule 404(b). The State asserts that the Defendant has waived the issues and cannot establish plain error. We agree with the State.

Rule 404(b) of the Tennessee Rules of Evidence provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:

> (1) The court upon request must hold a hearing outside the jury's presence;
>
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
>
> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

-16-

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

See also State v. Thacker, 164 S.W.3d 208, 240 (Tenn. 2005); State v. Parton, 694 S.W.2d 299, 302 (Tenn. 1985). Rule 404(b) is generally one of exclusion, but exceptions to the rule may occur when the evidence of the otherwise inadmissible conduct is offered to prove the motive of the defendant, identity, intent, the absence of mistake or accident, opportunity, or a common scheme or plan. State v. Toliver, 117 S.W.3d 216, 230 (Tenn. 2003); State v. McCary, 119 S.W.3d 226, 243 (Tenn. Crim. App. 2003). In addition to these exceptions, evidence of other acts may be admitted to provide the jury with necessary contextual background. State v. Gilliland, 22 S.W.3d 266, 272 (Tenn. 2000); see also Neil P. Cohen et al., Tennessee Law of Evidence § 4.04[13] (6th ed. 2011) (evidence admissible to tell the "complete story").

If the trial court substantially complies with the procedural requirements of Rule 404(b), we will review the trial court's determination for an abuse of discretion. Thacker, 164 S.W.3d at 240 (citing State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997); State v. Baker, 785 S.W.2d 132, 134 (Tenn. Crim. App. 1990)). However, if the trial court fails to substantially comply with the requirements of the rule, then the trial court's decision should be afforded no deference by the reviewing court. DuBose, 953 S.W.2d at 652.

Although the Defendant raised an objection to the admission of the SANE report under Rule 404(b) prior to trial, he failed to have the trial court rule on the issue. Then, during trial, when the State asked to introduce the SANE report as an exhibit, the court asked the Defendant if there was any objection. After defense counsel reviewed the report, the trial court again asked if there was an objection, to which counsel replied, "No, your Honor." We find that because the Defendant did not ask the trial court to make a specific ruling on the admissibility of the SANE report at the pretrial hearing and did not object to its admission at trial, he has waived consideration of this issue. See Tenn. R. App. P. 36(a) (providing, "Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.").

Likewise, we find that the Defendant has waived consideration of his claim as it relates to the victim's testimony about the Defendant holding a dagger to her throat. The Defendant did not object to this testimony under Rule 404(b) at the pretrial hearing or during trial. The Defendant cannot now claim entitlement to relief when he failed to take any action to prevent the alleged error at trial. Tenn. R. Evid. 103.

When a party fails to take the necessary steps at trial to prevent an error, this Court may exercise plain error review. See State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000); Tenn. R. App. P. 36(b). Under plain error review, this Court will grant relief only if the following prerequisites are met:

(1) the record clearly establishes what occurred in the trial court;
(2) a clear and unequivocal rule of law was breached;
(3) a substantial right of the accused was adversely affected;
(4) the accused did not waive the issue for tactical reasons; and
(5) consideration of the error is "necessary to do substantial justice."

Smith, 24 S.W.3d at 282 (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). The presence of all five factors must be established by the record before this Court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established. Smith, 24 S.W.3d at 283. Additionally, the error must have been of such great magnitude that it probably changed the outcome of the trial. Id.; Adkisson, 899 S.W.2d at 642. The accused has the burden of persuading an appellate court that the trial court committed plain error. See State v. Bledsoe, 226 S.W.3d 349, 355 (Tenn. 2007).

Although the record in this case clearly establishes what occurred in the trial court, it does not demonstrate the existence of the remaining prerequisites for plain error review. As pointed out by the State, the SANE report contains only a generalized statement about prior domestic abuse; it reads, "Client reports domestic violence since 8/11." At trial, the victim testified in a similar vein that during her marriage to the Defendant, their arguments had increased in frequency and violence, and the Defendant does not challenge the propriety of this testimony on appeal. Moreover, while questioning Rollins, the prosecutor did not refer to the statement or bring out that portion of the SANE report. Based upon the foregoing, we are not persuaded that the trial court committed plain error when it admitted the SANE report.

Additionally, the trial court did not commit plain error by admitting the victim's testimony that the Defendant held a dagger to her throat as no clear and unequivocal rule of law was breached by the admission of the testimony. The victim's testimony did not constitute evidence of a prior bad act under Rule 404(b). Rather, the testimony was admitted to establish the Defendant's guilt of aggravated assault, a charge for which he was on trial. The Defendant argues that the victim's testimony regarding the dagger incident constitutes an inadmissible prior bad act because count five of the indictment, which charged him with aggravated assault, was a nullity. However, as more fully explained in Part D, we reject the Defendant's challenges to count five of the indictment. This issue is without merit.

-18-

## C. Prosecutorial Misconduct

The Defendant asserts that the State's attorney committed prosecutorial misconduct by improperly appealing to class prejudice in order to overcome deficiencies in the proof.[5] The State responds that the Defendant has waived the issue by failing to raise a contemporaneous objection to the prosecutor's statement.

Closing argument is a valuable tool for both parties during trial, and wide latitude is given to counsel in presenting these arguments to the jury. State v. Goltz, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003). Consequently, a trial court is accorded wide discretion in its control of closing arguments. State v. Zirkle, 910 S.W.2d 874, 888 (Tenn. Crim. App. 1995). We will not interfere with that discretion unless we find an abuse of discretion. Smith v. State, 527 S.W.2d 737, 739 (Tenn. 1975). However, closing arguments "must be temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law." Goltz, 111 S.W.3d at 5. To show error, a defendant must demonstrate that the argument was so inflammatory or the conduct so improper that it affected the verdict to the defendant's detriment. Id.

In addition, prosecutorial misconduct does not constitute reversible error absent a showing that it has affected the outcome of the trial to the prejudice of the defendant. State v. Bane, 57 S.W.3d 411, 425 (Tenn. 2001) (citing Terry v. State, 46 S.W.3d 147, 156 (Tenn. 2001)). In order to be entitled to relief on appeal, the defendant must "show that the argument of the prosecutor was so inflammatory or the conduct so improper that it affected the verdict to his detriment." State v. Farmer, 927 S.W.2d 582, 591 (Tenn. Crim. App. 1996) (citing Harrington v. State, 215 Tenn. 338, 385 S.W.2d 758, 759 (Tenn. 1965)). This Court must consider the following factors when determining whether the argument of the prosecutor was so inflammatory or improper as to negatively affect the verdict: (1) the conduct complained of in light of the facts and circumstances of the case; (2) the curative measures undertaken; (3) the intent of the prosecutor in making the improper remarks; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case. State v. Philpott, 882 S.W.2d 394, 408 (Tenn. Crim. App. 1994) (citing Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976)).

In State v. Goltz, 111 S.W.3d 1 (Tenn. Crim. App. 2003), this Court set out the following five recognized areas of prosecutorial misconduct related to argument of counsel:

---

[5] Although the Defendant asserts that there were deficiencies in the State's proof, we note that he does not challenge the sufficiency of the evidence on appeal.

1.  It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.

2.  It is unprofessional conduct for the prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant. *See State v. Thornton*, 10 S.W.3d 229, 235 (Tenn. Crim. App. 1999); *Lackey v. State*, 578 S.W.2d 101, 107 (Tenn. Crim. App. 1978); Tenn. Code of Prof'l Responsibility DR 7-106(C)(4).

3.  The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury. *See Cauthern*, 967 S.W.2d at 737; *State v. Stephenson*, 878 S.W.2d 530, 541 (Tenn. 1994).

4.  The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict. *See Cauthern*, 967 S.W.2d at 737; *State v. Keen*, 926 S.W.2d 727, 736 (Tenn. 1994).

5.  It is unprofessional conduct for a prosecutor to intentionally refer to or argue facts outside the record unless the facts are matters of common public knowledge.

Goltz, 111 S.W.3d at 6.

In this case, the Defendant contends that the prosecutor committed misconduct in closing argument when she stated in regard to the quality of the police investigation, "You're not gonna find neighbors in Lonsdale to be witnesses for a domestic assault of any nature. You know, that's not gonna happen, they know that." He claims that in making the statement, the prosecutor improperly appealed to class prejudice. As noted by the State, the Defendant did not object to the prosecutor's argument at trial. We agree that by failing to raise a contemporaneous objection, the Defendant has waived our review of this issue. See Tenn. R. App. 36(a); State v. Little, 854 S.W.2d 643, 651 (Tenn. Crim. App. 1992) (stating that the failure to object to the prosecutor's alleged misconduct during closing argument waived later complaint).

Occasionally, this Court has, in its discretion, reviewed allegations of prosecutorial misconduct as "plain error" even in the absence of a contemporaneous objection. See, e.g., State v. Marshall, 870 S.W.2d 532 (Tenn. Crim. App. 1993), overruled on other grounds by State v. Carter, 988 S.W.2d 145 (Tenn. 1999) (determining in absence of objection that

prosecutor's jury argument was not plain error); State v. Butler, 795 S.W.2d 680 (Tenn. Crim. App. 1990) (considering whether statements of prosecutor were plain error despite lack of objection by defendant); Anglin v. State, 553 S.W.2d 616 (Tenn. Crim. App. 1977) (determining that in order to justify reversal on the basis of improper argument and remarks of counsel in absence of objection, it must affirmatively appear that the improper conduct affected the verdict to the prejudice of the defendant).

We conclude that the Defendant has failed to establish plain error. The record does not demonstrate that a clear and unequivocal rule of law was violated or that the Defendant did not waive the issue for tactical reasons. Moreover, we cannot conclude that the prosecutor's remarks affected the verdict to the prejudice of the Defendant when considered in light of the evidence at trial. This issue is without merit.

## D. Sufficiency of the Indictment

The Defendant contends that the trial court should have dismissed count five of the indictment because it fails to state an offense. Additionally, he asserts that the language in count five of the indictment failed to provide adequate protection against double jeopardy because there were two separate incidents of aggravated assault, to which count five could have applied–when the Defendant held the dagger to the victim's throat and when the Defendant used the box cutter to cut off the victim's underwear.

An indictment must inform the accused of "the nature and cause of the accusation." U.S. Const. amend. VI; Tenn. Const. art. I, § 9. Further, an indictment is statutorily required to "state the facts constituting the offense in ordinary and concise language, without prolixity or repetition, in such a manner as to enable a person of common understanding to know what is intended, and with that degree of certainty which will enable the court, on conviction, to pronounce the proper judgment." Tenn. Code Ann. § 40-13-202.

An indictment that achieves its "overriding purpose of notice to the accused will be considered sufficient to satisfy both constitutional and statutory requirements." State v. Hammonds, 30 S.W.3d 294, 300 (Tenn. 2000). Our supreme court has held that an indictment is sufficient to satisfy notice requirements if it "contains allegations that (1) enable the accused to know the accusation to which answer is required; (2) furnish the trial court an adequate basis for entry of a proper judgment; and (3) protect the accused from a subsequent prosecution for the same offense." Id. at 299 (citing State v. Hill, 954 S.W.2d 725, 727 (Tenn. 1997)). The question of the validity of an indictment is one of law, and as such, we review the issue *de novo*. Hill, 954 S.W.2d at 727.

Initially, we note that the Defendant did not raise the issue of the sufficiency of the indictment prior to trial. Aside from objections challenging the trial court's jurisdiction and objections contending that the indictment failed to charge an offense, all objections to an indictment must be raised prior to trial. See State v. Nixon, 977 S.W.2d 119, 120-121 (Tenn. Crim. App. 1997). Therefore, we conclude that the Defendant has waived the argument that the language in count five is insufficient to protect him from a subsequent prosecution for the same offense. See Tenn. R. Crim. P. 12(b)(2)(B) and (f) (stating that defenses and objections based on defects in the indictment must be raised prior to trial or they are considered waived); Jackson v. State, 475 S.W.2d 563, 565 (Tenn. Crim. App. 1971).

As to the Defendant's claim that the indictment fails to state an offense in count five, we find that the count sufficiently charges the offense of aggravated assault. Count five of the Defendant's indictment reads:

> And the Grand Jurors aforesaid, upon their oaths aforesaid, do further present that TERRENCE LAMONT MCDONALD, heretofore, to wit: On or about the ___ day of January, 2012, in the State and County aforesaid, did unlawfully and intentionally cause [K.M.] to reasonably fear imminent bodily injury, while said TERRENCE LAMONT MCDONALD was using a deadly weapon, in violation of T.C.A. § 39-13-102, and against the peace and dignity of the State of Tennessee.

The language of the indictment closely follows the statutory form of the crime, and the indictment cites to the code section for aggravated assault–Tennessee Code Annotated section 39-13-102. As noted by the State, if the Defendant had desired more details regarding the facts, he could have filed a motion for a bill of particulars.[6] See Tenn. R. Crim. P. 7(c); State v. Hicks, 666 S.W.2d 54 (Tenn. 1984). The Defendant is not entitled to relief on this issue.

### E. Unanimous Verdict

The Defendant contends that his conviction in count five for reckless endangerment violated his right to a unanimous jury verdict. He asserts that the trial court should have required the State to make an election, and it should have given a proper instruction on jury unanimity.

___

[6] It is clear from the record that the Defendant was aware of the facts that the State intended to rely on to establish the aggravated assault. At a pretrial motion hearing, defense counsel stated, "[W]e are trying basically two different cases at once. We are trying the aggravated assault with the knife followed by the rape, and they are the same day."

"A defendant's right to a unanimous verdict before imposition of conviction requires the trial court to take precautions to ensure that the jury deliberates over the particular charged offense, instead of assembling a 'patchwork verdict' based on the different offenses in evidence." Tidwell v. State, 922 S.W.2d 497, 501 (Tenn. 1996). Our supreme court has repeatedly held that, if the prosecution offers proof of multiple offenses in support of a single charged offense, it must elect the facts upon which it is relying to establish the charged offense. State v. Johnson, 53 S.W.3d 628, 630 (Tenn. 2001); State v. Kendrick, 38 S.W.3d 566, 568 (Tenn. 2001); State v. Brown, 992 S.W.2d 389, 391 (Tenn. 1999). Requiring an election "safeguards the defendant's state constitutional right to a unanimous jury verdict by ensuring that jurors deliberate and render a verdict based on the same evidence." Johnson, 53 S.W.3d at 631 (citing Brown, 992 S.W.2d at 391). When the evidence does not establish that multiple offenses have been committed, however, the need to make an election never arises. State v. Adams, 24 S.W.3d 289, 294 (Tenn. 2000).

In ruling on this issue at the motion for new trial hearing, the trial court found that it had committed error by failing to give a written jury instruction on election. Nonetheless, the court found that the Defendant was not entitled to relief because the prosecutor made clear to the jurors in closing argument that the State was seeking a conviction for aggravated assault based upon the incident with the dagger.

We agree with the trial court. The trial court readily admitted that under the facts of the case, it probably should have required the State to make a formal election. However, it is clear from the record that the State effectively made an election during its closing argument. In closing, the prosecutor delineated for the jury the facts upon which the State sought a conviction for aggravated assault:

Now, with respect to the last count which is aggravated assault, we believe that we have proven that before the rape occurred–several hours before the rape occurred, [the Defendant] used a knife. [The victim] refers to it as a dagger, but he held a knife to her throat and threatened to cut out her voice box. And you will recall this came after they had been arguing back and forth and she mouthed off to him and got smart with him, and he picked this article up, put it against her throat and because it is a deadly weapon and can cause harm, [the victim] was reasonable in her belief that–to have fear. Think about the context of this. They had been arguing, he's made at her. Think about the context that the fact that their arguance [sic] had increased in number and escalated in violence and seriousness, you know, over the course of their relationship and on this day, she felt fear.

In this case, there was no danger that the jurors were considering different offenses when deliberating on each individual count of the indictment.

This Court has previously determined that a trial court's failure to properly instruct the jury about the State's election may be harmless "where the prosecutor provides during closing argument an effective substitute for the missing instruction." State v. William Darryn Busby, No. M2004-00925-CCA-R3-CD, 2005 WL 711904, at *6 (Tenn. Crim. App. Mar. 29, 2005) (citing State v. James Arthur Kimbrell, No. M2000-02925-CCA-R3-CD, 2003 WL 1877094, at *23 (Tenn. Crim. App. Apr. 15, 2003)); State v. Michael J. McCann, No. M2000-2990-CCA-R3-CD, 2001 WL 1246383, at *5 (Tenn. Crim. App. Oct. 17, 2001), perm. app. denied (Tenn. Apr. 1, 2002); State v. William Dearry, No. 03C01-9612-CC-00462, 1998 WL 47946, at *13 (Tenn. Crim. App. Feb. 6, 1998), perm. app. denied (Tenn. Jan. 19, 1999)). Based on our review of the entire record in this matter, we conclude that any error was harmless beyond a reasonable doubt.

## F. Double Jeopardy

The Defendant claims that his convictions for two counts of aggravated rape violate principles of double jeopardy because his actions constituted one continuous offense. The State contends that the Defendant's convictions do not violate double jeopardy principles because each act of intercourse constituted a distinct and separate offense. Following our review, we agree with the State.

The double jeopardy clauses of the United States and Tennessee Constitutions provide that no person shall be twice put in jeopardy of life or limb for the same offense. U.S. Const. amend. V; Tenn. Const. art. I, § 10. The double jeopardy clauses have been interpreted to protect an accused from (1) a second prosecution following an acquittal; (2) a second prosecution following conviction; and (3) multiple punishments for the same offense. North Carolina v. Pearce, 395 U.S. 711, 717 (1969), overruled on other grounds by Alabama v. Smith, 490 U.S. 794 (1989); State v. Phillips, 924 S.W.2d 662, 664 (Tenn. 1996). The Defendant contends that the present case involves the third category.

Multiple punishment claims fall into one of two categories: (1) unit-of-prosecution claims; or (2) multiple description claims. State v. Watkins, 362 S.W.3d 530, 543 (Tenn. 2012). At issue here is a unit-of-prosecution claim which is raised when a defendant who has been convicted of multiple violations of the same statute asserts that the multiple convictions are for the same offense. See State v. Smith, 436 S.W.3d 751, 766 (Tenn. 2014) (citing Watkins, 362 S.W.3d at 543). Our supreme court recently explained in Smith that "[i]n determining the unit of prosecution, we first examine the statute in question to determine if the statutory unit of prosecution has been expressly identified." Id. at 678.

As relevant here, aggravated rape is the "unlawful sexual penetration of a victim by the defendant" when "[f]orce or coercion is used to accomplish the act and the defendant is armed with a weapon or any article used or fashioned in a manner to lead the victim reasonably to believe it to be a weapon" or when "[t]he defendant causes bodily injury to the victim." Tenn. Code Ann. § 39-13-502(a)(1) and (2) (2012). "Unlawful sexual penetration" means "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body . . . ." Tenn. Code Ann. § 39-13-501(7) (2012). The proof in this case established that the Defendant forced the victim to have vaginal intercourse and then, after she complained of pain, forced the victim to have anal intercourse. Both of these acts standing alone would meet the statutory definition of "unlawful sexual penetration" for the offense of aggravated rape. While the Defendant claims that there was "no lapse of time" between the two acts of penetration, this cannot be concluded from the victim's testimony regarding the offenses. Moreover, there is also nothing in the record to suggest that the Defendant merely used one form of penetration to facilitate another form of penetration.

Like the statutory definitions, our case law also makes clear that the sexual acts committed in this case were separate and distinct. Our supreme court has stated that

> "although separate acts of intercourse may be so related as to constitute one criminal offense, generally rape is not a continuous offense, but each act of intercourse constitutes a distinct and separate offense." Moreover, each of the above-described acts [namely vaginal intercourse and anal intercourse] is separately defined in [Tennessee Code Annotated section] 39-13-501(7) as a discrete type of sexual penetration subsumed by [Tennessee Code Annotated section] 39-13-502, the aggravated rape statute. Each act, in our opinion, is capable of producing its own attendant fear, humiliation, pain, and damage to the victim. Each type of penetration requires a purposeful act on the part of the perpetrator."

State v. Phillips, 924 S.W.2d 662, 664-65 (Tenn. 1996) (citation and footnotes omitted); see also State v. Kendrick, 38 S.W.3d 566, 569 (Tenn. 2001). We agree that in this case, each type of penetration required a purposeful act on the Defendant's part, with each act producing its own attendant fear, humiliation, pain, and damage.

Based upon the foregoing, we conclude that double jeopardy principles were not violated by the trial court's refusal to merge the Defendant's two convictions for aggravated rape.

## G. Sentencing

The Defendant contends that the trial court abused its discretion when it imposed 25-year sentences for aggravated rape. The Defendant asserts that the trial court's sentences were based upon an erroneous view of the facts and that the trial court improperly considered one enhancement factor.

When the record establishes that the trial court imposed a sentence within the appropriate range that reflects a "proper application of the purposes and principles of our Sentencing Act," this Court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. State v. Bise, 380 S.W.3d 682 (Tenn. 2012). A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" State v. Shaffer, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting State v. Moore, 6 S.W.3d 235, 242 (Tenn. 1999)). To find an abuse of discretion, the record must be void of any substantial evidence that would support the trial court's decision. Id. at 554-55; State v. Grear, 568 S.W.2d 285, 286 (Tenn. 1978); State v. Delp, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980). So long as the trial court sentences within the appropriate range and properly applies the purposes and principles of the Sentencing Act, its decision will be granted a presumption of reasonableness. Bise, 380 S.W.3d at 707. "[A] trial court's misapplication of an enhancement or mitigating factor does not remove the presumption of reasonableness from its sentencing determination." Id. at 709. Moreover, under those circumstances, this Court may not disturb the sentence even if it had preferred a different result. See State v. Carter, 254 S.W.3d 335, 346 (Tenn. 2008). The party appealing the sentence has the burden of demonstrating its impropriety. Tenn. Code Ann. § 40-35-401, Sent'g Comm'n Cmts.; see also State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

In determining the proper sentence, the trial court must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant made in the defendant's own behalf about sentencing. See Tenn. Code Ann. § 40-35-210; State v. Taylor, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The trial court must also consider the potential or lack of potential for rehabilitation or treatment of the defendant in determining the sentence alternative or length of a term to be imposed. Tenn. Code Ann. § 40-35-103 (2012).

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

(1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

(2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c) (2013).

Although the trial court should also consider enhancement and mitigating factors, the statutory enhancement factors are advisory only. See Tenn. Code Ann. § 40-35-114 (2013); see also Bise, 380 S.W.3d at 699 n. 33, 704; Carter, 254 S.W.3d at 343. We note that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." Carter, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" Id. at 343. A trial court's "misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." Bise, 380 S.W.3d at 706. "[Appellate courts are] bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." Carter, 254 S.W.3d at 346.

Initially, the Defendant contends that this Court should conduct a *de novo* review because the trial court failed to place on the record any reason for his sentence other than its consideration of enhancement factors. We disagree. A review of the record shows that the trial court considered both enhancement and mitigating factors, as well as the other relevant factors from Tennessee Code Annotated section 40-35-210. Thus, we review the trial court's sentencing determination for an abuse of discretion while affording the decision a presumption of reasonableness.

The Defendant also asserts that the trial court misapplied enhancement factor 14–abuse of a position of private trust. This Court has previously stated that the fact of a marriage alone is insufficient to warrant the application of enhancement factor (14) because a marital relationship does not necessarily engender trust between adults. State v. Paul

Graham, No. M2003-00331-CCA-R3-CD, 2004 WL 741666, at \*13-14 (Tenn. Crim. App. Apr. 7, 2004), *perm. to app. denied* (Tenn. Oct. 4, 2004). Instead, "the court must look to 'the nature of the relationship,' and whether the relationship 'promoted confidence, reliability, or faith.'" State v. Gutierrez, 5 S.W.3d 641, 646 (Tenn. 1999) (quoting State v. Kissinger, 922 S.W.2d 482, 488 (Tenn. 1996)). Such relationships "usually include[] a degree of vulnerability," and "[i]t is the exploitation of [that] vulnerability to achieve criminal purposes which is deemed more blameworthy and thus justifies application of the enhancement factor." Id. Consequently, our supreme court has held that the abuse of trust enhancement factor applies "where there is evidence that the nature of the relationship between the perpetrator and the . . . victim caused the victim to be particularly vulnerable." Id.

As to the abuse of a position of private trust in this case, the court stated:

I find that the marital relationship between [the Defendant] and the victim in this case was a position of private trust and that [the Defendant] used that position to accomplish these acts. He specifically stated through the testimony of [the victim] that she was his wife and that when he wanted to have [sex], that she was gonna give him some, and I think in his mind, in his interpretation of what the role and responsibility of a biblical wife is, is that she's gonna provide him sex whenever he wants it, and I think he used that position of private trust. And so, I do find that that enhancement factor applies here. But more so than that, I think it's significant in considering the facts and circumstances surrounding the offense and the nature of the circumstances.

We disagree with the trial court's conclusion that the Defendant abused a position of private trust based upon the nature of the marital relationship. We agree with the Defendant that trust was not established between the Defendant and the victim and that their relationship was not one that promoted confidence, reliability, or faith, as required by Gutierrez. Nevertheless, the Defendant is not entitled to relief. The record reflects that the trial court properly considered several other enhancement factors, including the Defendant's prior criminal convictions and past failures on probation. See Tenn. Code Ann. §§ 40-35-114(1), (8). Because the trial court relied on other reasons consistent with the purposes and principles of sentencing, we uphold the court's imposition of 25-year sentences. See Bise, 380 S.W.3d at 706.

### III. Conclusion

For the foregoing reasons, the judgment of the trial court is affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE